## Wytheville

### HICKS' ADMINISTRATRIX V. ROMAINE

#### June 11, 1914.

1. DEATH—*Negligence—Evidence—Conjecture.*—In an action for the death of one caused by the negligence of another, it is incumbent upon the plaintiff, in the absence of direct evidence, not only to show the existence of such circumstances as would justify the inference that the injury which caused the death was due to the negligence of the defendant, but must also exclude the idea that it was due to a cause with which the defendant was unconnected, and not leave the question to mere speculation and conjecture.

2. EVIDENCE — *Deductions — Different Theories — Evidence Supports Either.*—If it appears that the facts and circumstances from which a conclusion is sought to be deduced, although consistent with that theory, are equally consistent with some other theory, they do not support the theory contended for.

3. DEMURRER TO EVIDENCE—*Admissions—Facts Not Proved.*—While a party demurring to the evidence is considered as admitting the truth of his adversary's evidence and all just inferences that can be properly drawn therefrom by a jury, he does not admit any fact not proved by the evidence, nor does he admit any forced or illogical deductions from the testimony.

4. NEW TRIAL—*After-Discovered Evidence—Nature of.*—After discovered evidence which is in part merely corroborative, and in part so conflicting with the evidence given on the trial that it could not possibly produce an opposite result on the merits, if a new trial were awarded, does not warrant a new trial by the trial court.

Error to a judgment of the Circuit Court of Chesterfield county in an action of trespass on the case. Judgment for the defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*C. R. Sands* and *J. M. Gregory,* for the plaintiff in error.

*Willcox & Willcox,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action was brought to recover damages for the alleged negligent killing of the plaintiff's intestate, W. Plummer Hicks, by the defendant traveling in an automobile upon a public highway. There was a demurrer to the evidence by the defendant, which the trial court sustained and gave judgment for the defendant. Before the end of the term the court overruled a motion by the plaintiff for a new trial on the ground of after-discovered evidence, to which rulings the plaintiff duly excepted, and the rulings of the trial court complained of are before us for review upon a writ of error awarded the plaintiff.

The gravamen of the plaintiff's declaration and her theory, as brought out in the evidence, is that the decedent, plaintiff's husband, was knocked down, or while lying in the road was run over and killed by an automobile driven by the defendant at an unlawful rate of speed, without lights on the car, and without horn or signal device.

Defendant's grounds of demurrer to the evidence are: (1) That plaintiff had not established by competent evidence that plaintiff's decedent came to his death by being struck by an automobile driven by the defendant; (2) That the evidence does not establish the fact of any negligence on the part of defendant in relation to any duty he owed to the decedent; (3) That the evidence fails to

establish any causal connection between acts of the de-
fendant and the death of plaintiff's decedent; and (4)
That if it had been proved that defendant was driving
his automobile at the point on the public road where
decedent was injured at a speed of from twelve to fifteen
miles an hour, these acts do not, as a matter of law, con-
stitute negligence, and therefore the negligence alleged
in plaintiff's declaration had not been proved.

It appears from the evidence that the decedent and
his family, at the time of his death, lived at the village
of Swift Creek, situated about two miles north of the city
of Petersburg, in the county of Chesterfield, on the Rich-
mond and Petersburg turnpike, and was employed in a
bag factory in Petersburg, to which employment he cus-
tomarily went each morning, leaving his home about six
o'clock to arrive at his work in Petersburg at seven
o'clock, and returning each evening to his home, usually
walking each way on the turnpike. On the day that he
received the injuries causing his death, he left his home
at the usual hour in the morning, and went to his work
in Petersburg and worked that day until about three
o'clock, p. m., which was about the latest time any of the
hands worked on that day—Saturday. That night, be-
tween nine and ten o'clock, he was found on the turn-
pike between Petersburg and his home in almost a dying
condition by one A. Jeff and a colored woman, who were
then on their way to Petersburg. A short time there-
after he was carried to a hospital in Petersburg where
he died early the next morning, and without having made
any statement as to how the injuries to him occurred.
There were no witnesses to the happenings which caused
the decedent's injuries, and, therefore, the whole evi-
dence in the case is circumstantial, and the circum-
stances, in the main, are testified to, on behalf of the
plaintiff, by the said A. Jeff alone. One other witness,

a Mr. Lundie, who arrived on the scene not long after the decedent had been found in the road, was introduced and examined for the plaintiff, but there is nothing in his testimony that affords any light as to the causes of the injury to decedent. Dr. Powell, who attended the decedent after he had been carried to the hospital, was also introduced and examined as a witness for the plaintiff, but the testimony given by him relates only to the character of the wounds received by the decedent and their possible causes.

At the point where the decedent was found the turnpike is from sixty to seventy-five feet wide, and the point about three hundred yards from the north end of Bishop's bridge, which spans the Appomattox river, and from the bridge to a point where the turnpike makes a long curve towards Richmond, a short distance beyond where decedent was found, there is a considerable ascent, spoken of in the evidence as a hill, but from the point of the curve at or near the top of the hill to Bishop's bridge the turnpike is straight and the vision unobstructed.

After stating that he lived on the turnpike in Chesterfield county; that about five minutes after nine o'clock p. m. he started to Petersburg, walking along the 'pike, and overtook a colored woman also walking to Petersburg, the testimony given by said Jeff, as certified in the record, is in substance as follows:

"We went a little further and met a man and a woman walking, leaving Petersburg. Then we got a little further and just before we started down the hill to Petersburg I heard a machine coming up the hill. The darkie was just behind me. I says, 'Look out, there is a machine coming;' and I stepped out in the ditch. There is no pathway there, none at all; you have to walk in the middle of the road or get in the ditch. I stepped off

and the machine brushed right by me. If I had stayed where we were walking it would have been liable to hit me, but I got out of the way. . . I reckon it was making twelve or fifteen miles. We hadn't gone very far and on the opposite side of the road I saw something lying. I went on to go to it. It was about as far as from here to that window back there (indicating) I reckon. It was awful dark; you couldn't see. I says to the darky. 'Let's see what that is, who it is.' I says: 'Let's turn him over.' She says, 'No don't touch him; let's go and tell somebody.' So I felt in all my pockets and didn't have a match. I could not recognize the man because he was so full of blood and it was dark. . ." Then after relating that he went for an officer and how he got certain officers to come back with him to where he left the decedent in the road, and after making a number of unimportant statements, the witness proceeds: "Me and the officer went down and found his (decedent's) basket from twelve to fifteen feet towards Petersburg from where the body was found—from where his head lay, not where his feet were. I helped them to pick the stuff up; wasn't any out of the basket but a piece of meat and some potatoes. . . . . About that time the machine came down the hill that had passed me before. When it passed me going up the hill it only had these two dim lights, little bits of lights. They went from there and got up to about Rennie's lane, I think, and started up that lane and stopped. I went up, me and Mr. George Lundie, and tracked them where they went up in there and backed out. When he came back he had the lights lit, these big head-lights."

It is well to note just here that the witness later in his testimony discloses that it was not on the night of the accident to the decedent that he claims to have tracked the automobile up into Rennie's lane, where it

stopped and backed out, but on Sunday following the accident, after it had rained continuously from the night before—"a steady rain"—the witness claiming that he tracked an automobile over a macadamized road for a distance of nearly three quarters of a mile, though it was shown by other evidence in the case that other vehicles had passed over the road and perhaps a great many had traveled the same route during this time. George Rennie, who Jeff says was with him when he tracked the automobile to Rennie's lane, does not testify in the case. It is also to be observed that it is by no means clear from the witness Jeff's statement whether the machine which he says brushed right by him and which he attempts to identify was running on the same side of the 'pike as that on which the decedent was found, lying near the edge of the road, or on the opposite side. The testimony given by this witness, alone relied on to identify the machine that came back down the 'pike as the same machine that brushed by him at the top of the hill headed towards Richmond, is as follows:

After stating that he and certain officers, as well as others, had gotten back to the body of decedent, the witness was asked: "What took place after you got back to the body?" A. "They picked him up and lifted him around to keep his feet out of the road, and then this machine came back. I told them, 'There is the machine.'" Q. "What machine?" A. "Not Dunlop's —Romaine's machine." . . . Q. "Tell the court and jury what you said, what took place." A. "I said to the officers, 'There comes the machine now.' So they waived the machine down and stopped him. He jumps out." Q. "Who does?" A. "Romaine, the man who was running the machine. He says, 'What is the matter?' I suppose I can say the words I said. I said 'You have played hell.' He says, 'Why?' I says, 'You have

knocked this man and killed him down here.' He says,
'I didn't strike anything there.' He says, 'I hit some-
thing at the top of the hill.' I said, 'No you didn't be-
cause I was at the top of the hill and you didn't strike
me.' '' Q. ''Then what was done?'' A. ''They searched
the machine to try to find broken places, and they
claimed they didn't find it. They had only a little flash
light.'' Q. ''What became of the body then?'' A. ''They
picked it up and I think they put it in Romaine's ma-
chine. I don't know which machine took it, but Dun-
lop's or Romaine's machine.'' Q. ''When Romaine
came back to the body, did the machine have any lights
on it then?'' A. ''Yes, sir, had them burning bright
when he got there.'' Q. ''Had the lights been changed
on the machine from the time he went up to the time he
came back?'' A. ''Of course, when he went up he only
had little bits of candle lights; when he came back he had
his head-lights burning.'' Q. ''He stopped at the body?''
A. ''We stopped him before he got to the body.'' Q.
''You said, 'You have played hell here?' '' A. ''Yes,
sir.'' Q. ''He said no, what he struck was at the top of
the hill?'' A. ''He told me he didn't hit anything down
here, 'I struck something at the top of the hill.' I said
to him, 'You haven't because I was at the top of the
hill.' '' Q. ''Tell the jury was there anything at the top
of the hill he could have struck?'' A. ''No, sir, without
he run into me, and I got out of the way of him.''

The witnes further stated that it was some five min-
utes after the machine brushed by him at the top of the
hill before he got down to the body and met no other ma-
chine. He further said: ''It was awful dark, and you
couldn't see.'' ''You couldn't see over ten feet.'' ''I
reckon I got my face that close (indicating) to his (de-
cedent's) face; right down to him; tried to make out who
he was, and see if he was white or colored, and I

couldn't.'' Yet the witness undertakes to identify the machine that came from an opposite direction as the same machine that brushed by him at the top of the hill perhaps an hour before, and that too only from his subsequent observation of the machine that came from the opposite direction and was stopped at decedent's body, and also in face of the fact that he in the course of his examination as a witness admitted that he could not have told a blue machine from a black machine at the time the machine brushed by him at the top of the hill. He also admits that he was unable to tell whether the couple he said passed him just before he met the automobile that brushed by him was white or colored. Not only so, but it clearly appears from the witness's own statements that when he used the language, ''Romaine, the man who was running the machine,'' he did not know whether the party driving the machine that came back down the 'pike was even named Romaine, and he does not state that the Romaine to whom he referred was the defendant to this suit. He was asked: ''Did you know at the time of the coroner's inquest that this was Mr. Romaine and his machine?'' A. ''I took it by other people telling us it was Romaine's machine.''

Two physicians, Drs. Powell and Rennie, examined the decedent after he had been taken to the hospital, and both were examined as witnesses in this case, the one (Dr. Powell) for the plaintiff, and the other (Dr. Rennie) for the defendant. Both agree that an automobile, such as described by the witness Jeff, passing over a man's head would have crushed the skull, and that there was no crushing of even the facial bones. Dr. Rennie says that such a wound as decedent sustained might have been caused by an automobile tire passing over the face of the decedent and pressing the head down upon a tin can, but the proof not only is that the wounds

were on the side of the face away from the ground, but that there was no tin can or like substance there. Dr. Powell, testifying for the plaintiff, when asked what character of instrument would be necessary to cause wounds like those sustained by the decedent, answered: "I think a sharp-edged instrument." When asked whether such wounds could have been made by the automobile described by Mr. Jeff passing over the head of the decedent, Dr. Powell would only say that he "thought it merely possible."

Conceding, however, for argument's sake only that the decedent's fatal injuries were caused by an automobile, running at an unlawful speed, without lights and without signals, striking or running over his body in a public highway, where he had a right to be, still the vital question for determination in the case is whether or not the jury might have reasonably found that plaintiff's decedent lost his life without fault on his part, and solely as a result of the negligent operation of his automobile by the defendant. As we view the evidence it is too vague, insufficient and improbable to establish the fact that the automobile which came towards Petersburg and was stopped at the point on the turnpike where decedent lay was the same machine described by the witness, Jeff, as going from Petersburg at the rate of twelve to fifteen miles an hour, with two small lights, etc.; nor does it with sufficient clearness and satisfaction establish the fact that the machine going from Petersburg, which alone of the two machines could have struck or run over the decedent, was operated by the defendant in this case.

"In an action for the death of one through another's negligence, it is incumbent upon the plaintiff, in the absence of direct evidence, to show the existence of such circumstances as would justify the inference that the in-

jury which caused the death was due to the wrongful act of the defendant, and exclude the idea that it was due to a cause with which the defendant was unconnected, and not leave the question to mere speculation and conjecture.'' *Neal* v. *Chicago, &c., R. Co.,* 2 L. R. A. (N. S.) 909 and note.

This rule of law is nowhere better recognized as established than in decisions of this court too numerous to require citation. According to this rule, if it appears that the facts and circumstances from which a conclusion is sought to be deduced, although consistent with that theory, are equally consistent with some other theory, they do not support the theory contended for. In the case before us the facts and circumstances testified to are equally as consistent with the theory contended for by the defendant as with that contended for by the plaintiff. From these facts and circumstances, considering the nature of decedent's wounds, it might reasonably have been inferred by the jury that the decedent met with foul play some time before the automobile in question passed along the turnpike going from Petersburg and towards Richmond, as that his injuries were caused by an automobile running against or over him. There is uncontradicted evidence in the case that the decedent, as early as eight o'clock of the evening he received his injuries, was within a very short distance of the spot at which he was afterwards found lying, and at the time when seen (about eight o'clock) was in a drunken condition and in company with a person who has not been accounted for by any evidence in this case; that in the immediate surroundings of the place at which the decedent was found, a gang of toughs were engaged in a game of crap; and that (testified to by Jeff) this neighborhood was a very dangerous one, and serious crimes had been committed there.

While a party demurring thereto is considered as admitting the truth of his adversary's evidence, and all just inferences which can be properly drawn therefrom by a jury, he does not admit any fact not proven by the evidence, nor does he admit any forced or illogical deductions from the testimony.

In *Hansbrough* v. *Thorn,* 3 Leigh (30 Va.) 156, the opinion by Tucker, J., uses the following language entirely pertinent to the case here in judgment: "I will observe, before I proceed to pronounce on the particular case before us, that I think the expression 'that the demurrant must admit, or is considered as admitting, every fact which the evidence may conduce to prove,' must not be understood too broadly. The language of this court is more appropriate 'that the demurrant must be considered as admitting all that could reasonably be inferred by a jury from the evidence against him.' For evidence may conduce, that is, tend or contribute towards the proof of a fact which it is very far from establishing and which could not be fairly inferred from it."

We are of opinion that the ruling of the circuit court here complained of and which sustained the demurrer of the defendant to the evidence of the plaintiff, is without error.

Nor did the court err in overruling the motion of the plaintiff for a new trial, based solely and exclusively upon the after-discovered evidence set forth in an affidavit made by one Florence Wilkerson, about twenty years of age, the substance of which is that she, the evening that decedent was injured on the turnpike, in company with a Mr. Lewis, while standing on Bishop's bridge, saw a gentleman pass with a large basket on his arm going towards Chesterfield; that he was intoxicated, but was able to walk along and was walking; that she and Lewis went up the turnpike just behind the gentleman, and af-

ter walking up the hill for some time they saw him stumble and fall, at the same time dropping his basket. Affiant then undertook to describe where the man fell and says: "We passed him leaving him there and had only been gone two or three minutes when an automobile with two dim lights passed" them going up the turnpike and came near striking them; that this automobile was full of people and some of them were singing; that just about the time that affiant and her escort got to the top of the hill they met a couple coming towards Petersburg, but affiant did not know whether they were white or colored, but did know that one was a man and the other a woman. She fixes the time at which she saw the man fall on the turnpike at a little after nine o'clock, and says that no wagon or automobile passed her and her companion on the 'pike, and they met no other persons between the bridge and where they met the couple at the top of the hill; that when affiant and her escort went across to take a car back to Petersburg, the car was late and they started back to Petersburg walking, and when they got to where they saw the man stumble they again saw him and heard him groan; that just about that time they saw a buggy coming up the hill and called to the driver to stop, that a man was in the road and not to run over him, and found that there were three men in the buggy, and while affiant and escort were there an automobile came and stopped there, "but we did not remain to see what they did" and that affiant did not know until next morning who the man lying in the road was.

It will be observed, *first,* that when affiant saw the man on the 'pike it was light enough to see a basket dropped by him some distance, while Jeff testified that at the time he found decedent it was so dark that "he couldn't see over ten feet at the farthest;" *second,* that the automobile to which affiant refers passed her before she met the

couple referred to in her affidavit, whereas the evidence of Jeff shows that he met the couple referred to in his evidence before he met the automobile, showing, as would seem clear, that the two machines passed along the road between the time that decedent fell and the time he was found by Jeff; *third,* that the time affiant saw the man fall was a little after nine o'clock, while Jeff's evidence shows that he did not find decedent until about ten o'clock; and *fourth,* affiant says there were three men in the buggy which she met, while Jeff testified that there was "only one man" in the buggy he met.

It is apparent, we think, that this after-discovered evidence, as a matter of fact, does not add anything which would conduce to explain how decedent came to his death, nor does it connect the defendant to this action with his death in the remotest degree. On the contrary, what affiant states that is not merely corrobative of what had already been testified to at the trial of the case, tends to confound the facts testified to by plaintiff's leading witness, Jeff—in fact, contradicts some of them —and, therefore, with her evidence in the case, the cause of decedent's death would be left in greater mystery, if possible, than it was at the end of the trial already had, and could not possibly have produced an opposite result on the merits of the case, in which circumstances the refusal of another trial was entirely proper. *Norfolk, &c.* v. *Johnakin,* 94 Va. 290, 26 S. E. 830, and authorities cited.

Upon the whole case, the judgment of the circuit court is right and, therefore, must be affirmed.

*Affirmed.*