# Richmond.

## James C. Davis, Director General, etc. v.
## Mrs. Ida Maud Ellis, Admx.

### February 26, 1925.

### Reheard February 25, 1926.

1. Negligence—*Presumptions and Burden of Proof—Presumption from Accident.*—Negligence is not to be presumed because the plaintiff has received an injury, but the facts from which negligence may be inferred must be proved by competent evidence. The burden is on the plaintiff to show how and why the accident occurred.

2. Death by Wrongful Act—*Presumption of Negligence—Where Death Might Have Resulted from Either one of two Causes.*—In an action for the death of one through another's negligence, it is incumbent upon the plaintiff, in the absence of direct evidence, to show the existence of such circumstances as would justify the inference that the injury which caused the death was due to the wrongful act of the defendant, and exclude the idea that it was due to a cause with which the defendant was unconnected, and not leave the question to mere speculation and conjecture.

3. Demurrer to the Evidence—*Admission of Truth of Adversary's Evidence—Facts not Proven by the Evidence—Inferences.*—While a party demurring to the evidence is considered as admitting the truth of his adversary's evidence, and all just inferences which can be properly drawn therefrom by a jury, he does not admit any fact not proven by the evidence, nor does he admit any forced or illogical deductions from the testimony.

4. Negligence—*Injury Resulting from one of two Causes—Presumptions and Burden of Proof—General Rule.*—Where damages are sought to be recovered for injuries resulting from an accident alleged to have been caused by the negligence of defendant, the burden of showing negligence by a preponderance of the evidence is on the plaintiff, and if the injury might have resulted from one of two causes, for one of which the plaintiff was responsible, but not for the other, the plaintiff could not recover; neither could he recover if it was just as probable that the damage was caused by the one as by the other.

5. Evidence—*Negative Evidence—Whether Locomotive Carried Light—Case*

*at Bar.*—In the instant case, an action for death by wrongful act, three trainmen testified positively that there was a light on the tank of the engine that killed plaintiff's decedent as it backed through the yard going to the roundhouse, and that it continued to burn even after reaching the roundhouse. There were several other witnesses who corroborated their statements. Against this was the testimony of three witnesses to the effect that they saw no light. The court was of opinion that this presented a striking illustration of a conflict between negative and positive testimony, and that the legal effect of the testimony on this subject established the existence of the light at the time in question.

6. Negligence—*Presumptions and Burden of Proof—Presumption from Accident—Case at Bar.*—In the instant case, an action for death by wrongful act, deceased was employed as a brakeman on one of the yard engines working in defendant's railroad yard, and was therefore familiar with the general conditions existing there. At the time of the accident he was apparently performing no duty by reason of his employment as a member of the crew attached to his engine. So far as the evidence disclosed no possible duty carried deceased to the point where the accident took place. There was a conflict in the evidence as to whether there was a light upon the tank of the engine which killed deceased as it backed through the yard, but there was positive testimony that a lookout was kept. There was nothing in the record to indicate that the failure to keep a lookout or to carry a proper headlight in any way contributed to the injury of the deceased or was the proximate cause of such injury.

*Held:* That there was no evidence to justify a jury in finding as a fact that defendant was guilty of any negligence that caused or contributed to the death of plaintiff's decedent.

## ON REHEARING.

7. Appeal and Error—*Demurrer to the Evidence—Grounds for Demurrer must have been Specifically Stated in Writing in the Court Below.*—On appeal, when the case coming up is on a demurrer to the evidence, no ground of demurrer can be considered which has not been specifically stated in writing in the trial court.

8. Appeal and Error—*Demurrer to the Evidence—More Than one Cause of Demurrer to the Evidence—No Particular Ground Stated as Relied on.*—If a ground of demurrer to the evidence, as stated by the demurrant, is broad enough, when considered in the light of the facts and circumstances of the case, to embrace more than one cause of demurrer, and no particular ground is stated as relied on, the statute (Code of 1919, section 6117) is not complied with, and such ground of demurrer cannot be considered by the appellate court.

9. Appeal and Error—*Demurrer to the Evidence—Grounds of Demurrer—*

*Assignment of Error Based on a Ground of Demurrer which has not been Sufficiently Stated—Prejudice to Demurree.*—No assignment of error, based upon a ground of demurrer to the evidence which has not been sufficiently stated as prescribed by section 6117 of the Code of 1919, can be considered by the appellate court, whether any of the grounds embraced in the statement in the trial court be good or bad—and regardless also of whether the demurree has been prejudiced or not.

10. APPEAL AND ERROR—*Demurrer to the Evidence—Grounds for Demurrer must have been Specifically Stated in Writing in the Court Below—Case at Bar.*—In the instant case, an action for the death of a brakeman in defendant's railroad yard, defendant demurred to plaintiff's evidence; the demurrer to the evidence was as follows: "(1) That the plaintiff's intestate assumed the risk of receiving the injury complained of; and, (2) that the negligence of the plaintiff's intestate was the sole proximate cause of the injury complained of."

*Held:* That the Special Court of Appeals was without jurisdiction to consider an assignment of error "that defendant was not negligent," and was therefore precluded from considering the question of whether or not the evidence showed or was insufficient to show negligence on the part of the defendant.

11. DEMURRER TO THE EVIDENCE—*Admissions by Demurrant—General Rule.*—On the demurrer to the evidence, the demurrant is considered as admitting the truth of all his adversary's evidence and all just inferences that can properly be drawn therefrom by the jury, and as waiving all his own evidence which conflicts with that of his adversary or which has been impeached, and all inferences from his own evidence (although not necessarily in conflict with his adversary's) which do not necessarily result therefrom.

12. NEGLIGENCE—*Proximate and Remote Cause—Sole Proximate Cause—Brakeman Killed by Road Engine—Case at Bar.*—In the instant case, an action for the death of a brakeman of a switch engine killed in defendant's railroad yard when struck by a road engine of defendant on the main line track, it was urged that the brakeman had no duty to perform in the place he was when struck, and that it was not shown why he was there. There was a demurrer to the evidence, one of the grounds of which was that "the negligence of plaintiff's intestate was the sole proximate cause of the injury." The road engine was running backwards without a light or lookout as required by the rules of the railroad. The inquiry was whether the brakeman was guilty of negligence which was the sole proximate cause of his injury. If it be conceded that the brakeman had no duties to perform at that particular spot or at that particular time, the mere act of going there could of itself be considered, at the most, as only contributing to the cause of the injury and not the sole proximate cause thereof. But the intervening act on the part of

the defendant from which the injury followed as a direct and immediate consequence was the proximate cause of the brakeman's death.

13. NEGLIGENCE—*Proximate and Remote Cause—Statement of the Rule.*—It is not only requisite that damage actual or inferential should be suffered, but this damage must be the legitimate sequence of the thing amiss. The maxim of the law here applicable is that in law the immediate and not the remote cause of any event is regarded; in other words, the law always refers the injury to the proximate, not the remote cause. If an injury has resulted in consequence of a certain wrongful act or omission, but only through or by means of some intervening cause, from which last cause the injury followed as a direct and immediate consequence, the law will refer the damage to the last or proximate cause, and refuse to trace it to that which was more remote.

14. DEATH BY WRONGFUL ACT—*Death of Brakeman in Railroad Yard—Whether Brakeman was at Place of Injury in Pursuance of His Duties—Case at Bar.*—In the instant case, an action for the death of a brakeman of a switch engine when struck by a road engine on the main track in plaintiff's railroad yard, it was urged that the brakeman had no duties to perform at the place where he was when struck. The evidence showed that the brakeman was seen in the proximity of the switches which it was his duty to throw.

   *Held:* That upon this and other evidence the jury would have been justified in inferring that the brakeman was acting in the performance of his duties at the time of his injury, and on demurrer to the evidence the court must so infer.

15. DEMURRER TO THE EVIDENCE—*Admissions by Demurrant—General Rule.*—Upon a demurrer to the evidence, the testimony of witnesses for the demurree must be accepted as true unless inherently incredible, or judicially known to be untrue; and, if several inferences may be drawn from the evidence, differing in degrees of probability, those most favorable to the demurree must be adopted unless forced, strained or manifestly repugnant to reason.

16. MASTER AND SERVANT—*Assumption of Risk—General Rule.*—The true rule of law deducible from the authorities is, that the servant assumes all the ordinary, usual and normal risks of the business after the master has used reasonable care for his protection, and also all such other risks as he knows of, or which were so unquestionably plain and clear that he must have known of their existence and their danger to him.

17. MASTER AND SERVANT—*Assumption of Risk—Brakeman on Switching Engine Killed by a Road Engine—Case at Bar.*—The instant case was an action for the death of a breakeman of a switching engine who was killed by a road engine which was running backwards, without a light or lookout as required by the rules of the railroad, on the

main track. There was a demurrer to the evidence on the ground that the brakeman assumed the risk of receiving the injury complained of.

*Held:* That the brakeman had not assumed the risk.

18. MASTER AND SERVANT—*Brakeman on a Switching Engine Killed by a Road Engine—Lights on Tender of Road Engine—Case at Bar.*—The instant case was an action for the death of a brakeman on a switching engine killed by a road engine on the main track in defendant's railroad yard, when the road engine was running backwards. In view of all the evidence, both direct and circumstantial, relating to the question the jury might have found that there was no light on the rear end of the tender of the road engine at the time the brakeman was killed. Such being the case it was the duty of the appellate court to so find.

19. DEMURRER TO THE EVIDENCE—*Where Fair Minded Men may Differ.*—The rule is well established that when the question is one upon which fair minded men may differ, and the jury might properly find either for or against the plaintiff, upon a demurrer to the evidence the appellate court must find in favor of the demurree.

20. MASTER AND SERVANT—*Assumption of Risk—Brakeman on Switching Engine Killed by Road Engine—Lights and Lookout—Case at Bar.*—The instant case was an action for the death of a brakeman of a switching engine killed by a road engine backing on the main track through defendant's railroad yard without light or lookout. There was nothing to show that the brakeman knew, or had reason to know, that the passenger engine which injured him had detached its train of cars and would back up the main line at the time it did; and, as the jury might have found that both the rules of the company and custom required a light, if not a lookout, and that neither a light nor a lookout was on the tender at the time of the injury, he is not chargeable with knowledge of the danger to which he was exposed, and cannot be held to have assumed the risk.

21. MASTER AND SERVANT—*Assumption of Risk—Brakeman on Switching Engine Killed by a Road Engine—All Dangers Incident to the Movement of Trains Within a Railroad Yard—Case at Bar.*—A brakeman on a switching engine in a railroad yard does not assume the risk of all dangers incident to the movement of all trains within the limits of the company's yards, without regard to the circumstances or the character of the train which injured him. For example: he does not assume the risk of an injury caused by a road engine, engaged in an independent movement, in running backward through the yards at night, on the main line, and, contrary to custom and the rules, without a light or lookout, or other warning of its approach except the ringing of a bell.

22. APPEAL AND ERROR—*Judgment of Trial Court Overruling a Demurrer to the Evidence—Judgment not Plainly Wrong.*—The judgment of a trial

court overruling a demurrer to the evidence should not be inter-
fered with unless clearly and plainly wrong, as the judge heard the
witnesses testify and had the opportunity to observe their demeanor
and manner of testifying.

Error to a judgment of the Hustings Court, Part II,
of the city of Richmond, in an action of trespass on
the case. Judgment for plaintiff. Defendant assigns
error.

*Affirmed.*

The opinion states the case.

*Munford, Hunton, Williams & Anderson* and *Edmund
M. Preston,* for the plaintiff in error.

*Fulton & Wicker* and *Milton P. Bonifant,* for the
defendant in error.

McLEMORE, J., delivered the opinion of the court.

This case arises out of an accident occurring in
Boulton yards of the R. F. & P. R. R. located in the
city of Richmond, a map of which is filed herewith
in order that the evidence referring to the situation
may be the more readily understood. (See page 386.)
While this map is not drawn to scale, it represents
with approximate accuracy the principal places, and
the sundry tracks referred to in the evidence, and in
the discussion presently to follow:

The tracks, of which there are quite a number, are
usually referred to as running north and south. From
the hump ladder switch a track swings off in an easterly
course and is known as the ladder track; leaving this
ladder track and extending in a southerly direction
are three hump tracks Nos. 60, 61 and 62 as shown
on the plat.

Ellis, the decedent, was a flagman on a yard engine

engaged in switching cars, making up trains, etc., his engine being known as No. 45, and had just before the accident been switched in upon ladder track and thence upon track No. 62, there to remain until certain movement of train No. 104, consisting of engine, tender and about twenty-five cars (the cars being pushed in front of the engine) proceeding from Acca in a southerly direction along thoroughfare track, could be completed. The cars in train 104 were to be placed in tracks 60 and 61, which necessitated first switching them on ladder track and thence into hump tracks 60 and 61.

At the time of the accident the Acca train was pushing the cars from thoroughfare track into hump track, 60 or 61, the engine being just opposite hump ladder switch which is on the east side of thoroughfare track. Just at this moment engine and tender No. 2 were backing up the north bound main line track which is immediately west of thoroughfare track, having proceeded from Byrd Street station for the purpose of being delivered at the roundhouse in Boulton yard. Neither the engineer nor fireman knew of the accident until they had reached the roundhouse.

This engine and tender, backing with the tender in front, passed the engine moving train 104 opposite hump ladder switch, and a few feet north of where the two engines passed, and immediately after their passing, the deceased was found mortally wounded, lying between main line and thoroughfare tracks, and about fifteen to twenty-five feet north of hump ladder switch. In order to turn this switch the operator must be on the east side of thoroughfare track, as the switch was on that side.

No witness actually saw the accident or knows how it happened. The nearest approach to a positive

statement on the subject, and the only statement in connection therewith, comes from the plaintiff's witness Long, who was the engineer on train No. 104. This testimony will be referred to in the further discussion of the case. As engine 104 and engine 2 passed each other they were moving at the rate of from four to six miles an hour. The record offers no explanation as to why the deceased was at this point, when he got there, or how the accident occurred.

There is considerable conflict of evidence as to whether there was a light on the tank of engine No. 2 as it backed through the yard going to the roundhouse. Both the engineer and fireman of this train state positively there was such a light, and that it continued to burn even after reaching the roundhouse. There are several other witnesses that corroborate their statements. Against this is the testimony of R. M. Allen, brakeman Moon, and conductor Vaughan, to the effect that they saw no light. The following from the testimony of R. M. Allen may be taken as fairly illustrative of the whole:

"Q. Did you look at the engine and tender when the rear end of the tender came by you?

"A. I didn't pay any more attention to it than to any other engine going by from Elba station.

"Q. Do I understand you to say that there was no lamp on the tender of No. 2, or that you just did not see it?

"A. I say if it was there I did not see it.

"Q. Then you will not positively say that the lamp was not on there?

"A. No.

"Q. But you do say you did not see it?

"A. I did not see it."

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Q. Did you look at the engine and tender when the rear end of the tender came by you?

"A. I didn't pay any more attention to it than to any other engine going by from Elba Station."

With these as the material facts of the case, we are called upon to decide whether or not the trial court was right in overruling the defendant's demurrer to the evidence, and entering judgment for the plaintiff.

[1] The burdens which the demurrant must carry in this class of cases is too well settled to require restatement. There are, however, certain elementary principles of the law of negligence which must be kept in mind in considering whether or not the evidence is sufficient to sustain the judgment of the court.

"Negligence is not to be presumed because the plaintiff has received an injury, but the facts from which negligence may be inferred must be proved by competent evidence. The burden is on the plaintiff to show how and why the accident occurred." *So. Ry. Co.* v. *Hall's Adm'r*, 102 Va. 135, 45 S. E. 867.

The deceased was employed as a brakeman on one of the yard engines working in Boulton yard, and was therefore familiar with the general conditions existing there, and of the ceaseless activity and noise incident upon the movements of engines, the shifting of cars and the making-up of trains.

At the time of the accident he was apparently performing no duty by reason of his employment as a member of the crew attached to engine No. 104. His train having gone into hump ladder track No. 62 to there remain until Acca train No. 104 could place about twenty-five cars on sidings, and these having not yet been placed left Ellis at the time with no duty to perform.

It is urged by counsel in argument that deceased

had left his train and gone west, passing as many as three tracks to the place of the accident, in order to reach the hump ladder switch so as to be ready to turn his train out of hump track 62 as soon as train 104 had placed its cars in tracks 60 and 61 and cleared the ladder track. The weakness of this contention rests in the fact that he was not injured at the switch, but across the track from the switch some fifteen to twenty-five feet away—with no possible duty carrying him there in so far as the evidence discloses.

It is not known how or why he crossed thoroughfare track and came in contact with engine or tender of No. 2. The only inference that can be drawn from the evidence is that he crossed thoroughfare track immediately behind engine 104, and at once came in collision with engine or tank No. 2, moving in an opposite direction on the next track to the west. This is apparent from the testimony of plaintiff's own witness Long, engineer on Acca train No. 104, moving very slowly south, he of course being on the right side of the cab and next to the main line track:

"Q. Where was Ellis when you first saw him?

"A. I can't say I ever saw him.

"Q. You saw a man fall did you not?

"A. No; I only saw a light—an unusual motion of a light.

"Q. What do you mean by 'unusual?'

"A. Something like a fellow falling, or trying to catch himself."

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. Where was that light at the time you saw that unusual move?

"A. It was slightly back of me; I could just see it by a glance out of my eye; it was an unusual move and attracted my attention that instant."

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. You were intent on looking at the signal up ahead, and that is why you didn't see him when you passed?

"A. No; I don't know whether he was there when I passed; he may have stepped around behind me."

That he (Long), watching for lights and signals as his train was being pushed into the switch, would have seen the decedent with a lamp in his hand had he been on the ground by the side of Long's train as it passed him, can scarcely be doubted. The conclusion seems irresistible that he stepped from behind the tender as suggested by his own witness.

We are without any explanation as to how he came in collision with the train that must have killed him, and are unable to say how or why the accident occurred.

The motion of the lantern as described by plaintiff's witness, Long, could have been the result of his being struck by the backing tank of engine No. 2. It could have been caused by his walking against the engine or tank while looking in an opposite direction, or what is more probable, he may have crossed the thoroughfare track immediately behind engine 104 and have missed his footing or stumbled over the end of a cross tie, and have fallen under the engine or tank of No. 2. Certainly this last explanation is as probable as that he was on the main line track with a lantern in his hand, and bell on the engine continuously ringing, and was so oblivious to the perilous surroundings of which he was familiar, as to be run down and killed by a train moving at the rate of a man walking briskly.

[2] "In an action for the death of one through another's negligence, it is incumbent upon the plaintiff, in the absence of direct evidence, to show the existence of such circumstances as would *justify* the inference that the injury which caused the death was due to

the wrongful act of the defendant, and *exclude the idea*
that it was due to a cause with which the defendant
was unconnected, and not leave the question to mere
speculation and conjecture." *Hicks' Adm'x* v.
*Romaine*, 116 Va. 401, 409, 82 S. E. 71, 74. (Italics
supplied.)

Assuming for the moment the negligence of defend-
ant's employees in the operation of engine No. 2
without a head light, is there any fact established by
the evidence to show that such negligence was the
proximate cause of the injury? We think not. Being
left to speculate or guess as to how the accident oc-
curred, we have no right to base an inference upon a
speculation. This court is without facts from which
to determine whose negligence it was that caused the
decedent's death. It is not a case of conflicting testi-
mony, but absence of testimony. In such circum-
stances there was no legitimate evidence sufficient to
justify a verdict and the demurrer should have been
sustained.

[3] In *Hicks' Adm'x* v. *Romaine*, 116 Va. 401, 411,
82 S. E. 71, 74, it is said:

"While a party demurring thereto is considered as
admitting the truth of his adversary's evidence, and
all just inferences which can be properly drawn there-
from by a jury, *he does not admit any fact not proven
by the evidence, nor does he admit any forced or illogical
deductions from the testimony.*

"In *Hansbrough* v. *Thorn*, 3 Leigh (30 Va.), 156, the
opinion by Tucker, J., uses the following language
entirely pertinent to the case here in judgment: 'I
will observe, before I proceed to pronounce on the
particular case before us, that I think the expression
"that the demurrant must admit, or is considered as
admitting, every fact which the evidence may conduce

to prove," *must not be understood too broadly.* The language of this court is more appropriate "that the demurrant must be considered as admitting all that could *reasonably* be inferred by a jury from the evidence against him." *For evidence may conduce, that is tend or contribute towards the proof of a fact which it is very far from establishing, and which could not be fairly inferred from it.'* " (Italics supplied.)

So in *Mitchell* v. *So. Ry. Co.*, 118 Va. 642, 88 S. E. 56, it is said:

"Evidence may be so vague, uncertain and self contradictory as to deprive it of probative force" (on demurrer).

[4] In the case of *General Accident, etc., Corp.* v. *Murray*, 120 Va. 115, 126, 90 S. E. 620, 624, which was a demurrer to evidence case, Judge Cardwell, says:

"The case is analogous to that class of cases frequently considered and ruled upon by this court, in which damages were sought to be recovered for injuries resulting from an accident alleged to have been caused by the negligence of the defendant, and wherein it has been uniformly held that *the burden of showing negligence by a preponderance of the evidence was on the plaintiff, and if the injury* might have resulted from one of two causes, for one of which the plaintiff was responsible, but not for the other, the plaintiff could not recover; *neither could he recover if it was just as probable that the damage was caused by the one as by the other.*" *Washington & Old Dom. Ry.* v. *Weakley*, 140 Va. 796, 125 S. E. 672. (Italics supplied.)

In *Steele's Adm'r* v. *Colonial Coal Co.*, 115 Va. 385, 79 S. E 346, where the defendant demurred to the evidence, it is said, page 388 (79 S. E. 347):

"The general doctrine is fundamental that in an

action to recover damages for personal injuries, negligence will not be presumed, but the burden rests upon the plaintiff to prove it affirmatively and by a preponderance of the evidence. *This rule is nowhere more strongly stated, or more steadfastly adhered to than in the decisions of this court."* (Italics ours.)

The failure to keep a lookout, and the allegation that no light was upon the tank of engine No. 2, as it backed through the yard, are relied upon to establish the negligent handling of the No. 2 movement. Suffice it to say that, as to the lookout, the uncontradicted evidence of P. E. Laneave, the fireman on this engine, is that he was in his place on the engine at the time of the accident (corroborated by engineer H. P. Mayo) and was keeping a lookout.

"Q. Where was Tom Long's engine when you passed it?

"A. He was shoving his cars up on the hump; very near shoving his cars up on the hump.

"Q. His train was still moving?

"A. When I passed him, yes.

"Q. Were you keeping a lookout at that minute?

"A. I was looking out all the time.

"Q. Looking out all the time after you got back into your cab?

"A. Yes, sir.

"Q. And you did not see Ellis at all?

"A. I did not see Ellis."

[5] As to whether there is any real conflict in the evidence with respect to the headlight is a question that may admit of differences of opinion. The witnesses for the plaintiff have been heretofore adverted to and the probative force of this evidence is of doubtful value. It presents a striking illustration of negative testimony, against which is the definite and specific

evidence of engineer Mayo, fireman Laneave, and engineer Long, plaintiff's witness, who said in answer to a question with reference to this train No. 2:

"Q. Was there a light on the locomotive?

"A. Yes, sir; a light on the rear of the tank."

We are of the opinion, therefore, that the legal effect of the testimony on this subject establishes the existence of a light on the tank at the time the same passed Long's engine, but whether it did or not is of little consequence as there is nothing in the record to indicate that the failure to keep a lookout or to carry a proper headlight on the end of the tank in any way contributed to the injury of the deceased.

The views herein expressed and the conclusions reached vender it unnecessary to enter into a discussion of the remaining questions raised in the briefs and argued before the court.

[6] Considering the case from any and all angles, we are of the opinion there is no evidence to justify the jury in finding, as a fact, that defendant company was guilty of any negligence that caused or contributed to the accident resulting in the death of Warren Graves Ellis.

The judgment of the trial court will therefore be set aside and judgment entered here for the defendant company with costs.

## ON RE-HEARING.

Richmond, February 25, 1926.

CHINN, J., delivered the opinion of the court.

The defendant in error (hereinafter designated as plaintiff) instituted her action against the Richmond, Fredericksburg and Potomac Railroad Company (here-

inafter designated as defendant) to recover damages for the death of her husband, Warren G. Ellis, which she alleged was caused by the negligence of the defendant. After all the evidence on both sides had been produced at the trial of the case in the court below, the defendant tendered in writing a demurrer to the evidence, and the jury thereupon awarded plaintiff $10,-000.00 damages, subject to the court's decision upon said demurrer. The trial court overruled the demurrer and entered judgment for the plaintiff, to which judgment a writ of error was awarded the defendant. The case was argued and submitted to this court on the 10th day of December, 1924, and on February 26, 1925, this court rendered an opinion reversing the judgment of the trial court on the demurrer and entered judgment for the defendant. A rehearing having been granted the case is now again before us for review.

In the petition for rehearing and on the second argument of the case, counsel for the plaintiff lay particular emphasis upon the point that defendant's demurrer to the evidence does not specificially allege as a ground of demurrer that defendant was not negligent, and for this reason the question of defendant's negligence cannot be considered by this court. This point does not seem to have been made in the original briefs filed in the case, the discussion by both sides having been centered for the most part upon the question of defendant's negligence, and I am informed by my associates that this was also the case in the original oral argument. But, however that may be, in view of the fact that the point is not urgently stressed, a complete reconsideration of the case would seem to be necessary.

In its petition for a writ of error the defendant

assigns three separate and distinct grounds for its contention that the trial court erred in overruling the demurrer to the evidence, as follows:

"(a) The defendant was not negligent.

"(b) That the negligence of plaintiff's intestate was the sole and proximate cause of the injury.

"(c) That plaintiff's intestate assumed the risk of the injury."

The demurrer to the evidence filed by defendant in the trial court is as follows:

"(1) That the plaintiff's intestate assumed the risk of receiving the injury complained of; and,

"(2) That the negligence of the plaintiff's intestate was the sole proximate cause of the injury complained of."

The statute relating to the subject of demurrers to the evidence (section 6117 of the Code) has been so elaborately and definitely construed in several decisions of the Supreme Court of Appeals of this State that little or no doubt can now remain as to its purpose or the proper method of its application.

In *Saunders* v. *Southern Railway Company*, 117 Va. 396, 84 S. E. 650, where the demurrer was in general terms, Judge Harrison, speaking for the court, said:

"The language of the statute is too plain to admit of doubt, or call for interpretation * * * * *. These statutory provisions are *mandatory and preclude the idea of jurisdiction* to consider a demurrer to evidence, unless the grounds of such demurrer are specifically stated in writing. The statute is a wise one that should be upheld and enforced as it is written. Its salutary purpose would be defeated and the statute practically abrogated if it were permissible to modify it by engrafting exceptions upon it." (Italics supplied.)

In *McMenamin* v. *Southern Railway Company*, 115 Va. 822, 80 S. E. 596, in which the question was whether the grounds specifically stated in defendant's demurrer were sufficient under the statute to embrace the cause of demurrer actually relied on, it was said:

"The object of that statute was at least twofold. First, to require the demurrant to give notice in writing of the grounds of demurrer or causes of demurrer which he intended to rely on, and, second, to prevent him from assigning grounds of demurrer in the appellate court wholly different from those relied on in the trial court.

"The demurrant knows, or ought to know, before demurring, in what respect the demurree has failed in his proof, and there is no more hardship in requiring him to specifically state it than there is in requiring a party demurring to a declaration to state specifically his grounds of demurrer. One is a demurrer to his adversary's pleading and the other to his adversary's proof. In both cases the legislature, it is clear, intended that the grounds of demurrer be stated with reasonable certainty, and that no grounds other than those stated should be considered."

In *Black* v. *Daughtry*, 130 Va. 24, 107 S. E. 694, where the demurrer to the evidence stated two grounds, and there were four separate assignments of error, the question was whether the grounds stated in the demurrer were sufficiently specific to permit the court to consider any of the assignments of error before it. After a close analysis of the grounds stated in the demurrer and of the assignments of error, it was held that, under the circumstances of the case, neither ground of demurrer was sufficient, for the reason that any one of them might mean "any one of three things." Judge Sims concluded the opinion of the court in the following language:

"The holding of the cases mentioned may be summarized as follows:    When the ground, or grounds, of demurrer to evidence stated in the trial court are broad enough to embrace mcre than one ground, and no particular ground, or grounds, is or are specifically stated as relied on, the statute on the subject is not complied with; and, whether any of the grounds so embraced in such statement be good or bad, and regardless also of whether the demurree has been prejudiced by the default of the demurrant in the premises, no assignment of error based upon such ground or grounds of demurrer can be considered by the appellate court."

It can now, therefore, be safely said:

[7] (1) That on appeal, when the case coming up is on a demurrer to the evidence, no ground of demurrer can be considered which has not been specifically stated in writing in the trial court.

[8] (2) That if a ground of demurrer, as stated by the demurrant, is broad enough when considered in the light of the facts and circumstances of the case to embrace more than one cause of demurrer, and no particular ground is stated as relied on, the statute is not complied with, and such ground of demurrer cannot be considered by the appellate court.

[9] (3) That no assignment of error, based upon a ground of demurrer which has not been sufficiently stated as prescribed by the above propositions, can be considered by the appellate court, whether any of the grounds embraced in the statement in the trial court be good or bad—and regardless also of whether the demurree has been prejudiced or not.

[10] Viewing this case in the light of the above rules deduced from the statute by our Supreme Court of Appeals, it is immediately evident that this court is

without jurisdiction to consider defendant's assignment of error (a) "That defendant was not negligent," and is therefore precluded from considering the question of whether or not the evidence shows or is insufficient to show negligence on the part of the defendant.   The question of defendant's negligence being thus excluded, we are brought to the consideration of the. two assignments of error which are based upon the grounds of demurrer stated and relied on by the defendant in the court below.   Taking up the grounds of demurrer in the order in which they are assigned in the petition, the first to be considered is:

"That the negligence of the plaintiff's intestate was the sole and proximate cause of the injuries complained of."

In considering this ground of demurrer, which is a pleading and contains all the evidence which is to be taken in connection with the ground assigned, this court will have to ascertain from the evidence whether or not (1) the deceased was negligent; and if so (2) whether his own negligence was the *sole* proximate cause of the injuries he received, as alleged, without any other cause contributing to the occurrence of the injury, whether such other cause consisted of defendant's negligence or the act of a third person.   And in making this investigation, as the defendant has not denied in its demurrer that it was guilty of negligence, that question, as hereinbefore stated, must be excluded from consideration by this court.

[11] Bearing in mind the familiar rule applicable to demurrers to evidence that the demurrant is considered as admitting the truth of all his adversary's evidence and all just inferences that can properly be drawn therefrom by the jury, and as waiving all his own evidence which conflicts with that of his adversary or

which has been impeached, and all inferences from his own evidence (although not necessarily in conflict with his adversary's) which do not *necessarily* result therefrom (*Duncan* v. *Carson*, 127 Va. 306, 103 S. E. 665, 1055, 262) the facts of this case, so far as pertinent to the ground of demurrer now being considered, may be stated as follows:

Plaintiff's intestate, W. G. Ellis, received the injuries which gave rise to this suit in Boulton yards of the defendant company, located in the city of Richmond,

about 11:30 o'clock on the night of June 18, 1918. At the time of the accident deceased was employed as a brakeman in connection with one of the defendant company's engines which was used for switching operations in said yards.

For convenience, the map filed with the former opinion in the case, showing the relative locations of the tracks and switches referred to in the evidence, is herewith filed. As therein stated, the map is not drawn to scale and is not, therefore, accurate as to measurements, but will serve the purpose for which it is used.

The main line and thoroughfare tracks are generally spoken of as running north and south; north being in the direction of Washington and south in the direction of Byrd Street station in the city of Richmond.

The train to which deceased was attached, consisting of engine and tender, is designated in the evidence as No. 45, and its crew consisted of A. B. Holt, conductor, S. B. Morris and W. G. Ellis, the decedent, brakemen, and J. M. Porter, engineer.

Shortly before the accident No. 45 had been taken by its crew from the thoroughfare into the shop ladder track which, though not shown on the map, branches from the thoroughfare, and, after picking up a car from the shop ladder, backed through the thoroughfare into the hump ladder track and thence into hump track No. 62; the purpose being to push the car, which was connected with the front of the engine, down the ladder track and through the thoroughfare into track 34. While No. 45 was on the "hump" in the execution of this movement, a long train of cars came down the main line track from the north for the purpose of crossing into thoroughfare track at the cross over switch, and placing the cars in hump tracks 60 and 61. The engine engaged in this operation was called No. 104, and in making the movement described faced south, pushing twenty or twenty-five cars immediately ahead, with its tender in its customary position immediately behind the engine. This was generally spoken of as Tom Long's train, and its crew consisted of one Vaughan, conductor, Thomas Long, engineer, and J. B. Tatum and one Wrenn, brakemen. The hump ladder switch and the switch leading from hump ladder track into track 60 were only a step apart, and referred to generally as the double switches.

When Long's train came down, Holt, the conductor

of No. 45, was ordered to keep his train on the "hump" until Long's train completed its movement and cleared the ladder track, and while Long's movement was in progress No. 45 was resting partly in hump track 62 and partly on the ladder track. Just before Long's engine reached the hump ladder switch in making his movement, defendant's spot engine No. 2, which was running backwards up the main line track from Byrd Street station, shoving its tender ahead, passed Long's engine, and Ellis was found immediately afterwards lying between the main line and thoroughfare tracks with his arm completely severed close to his shoulder, from which injury he died the next day. No one actually saw Ellis at the moment he was struck and injured as described, but plaintiff's witness. Thos. Long testified as to the facts surrounding the occurrence. The substance of his testimony is, that as he came into the thoroughfare track he was sitting on the right side of his cab facing south and next to the main line track, watching the brakemen standing on top of the box car immediately ahead of the engine for any signals which might be passed back from him by the conductor and brakeman riding on the car on the extreme front end of the train, which at the time of the accident extended up on the "hump;" that he did not see Ellis as he passed and does not know whether he was there or not, "he may have stepped around behind me;" that just as No. 2 passed going in the opposite direction, witness saw "an unusual motion of a light, something like a fellow falling, or trying to catch himself." "It was slightly back of me, and I could just see it by a glance out of my eye; it was an unusual move and attracted my attention at that instant." Witness immediately applied his emergency brakes and brought his train to a stop with his engine resting on

the hump ladder switch, got down from his cab, and found Ellis lying at the point where he saw the unusual movement of the light; at the same moment the rear end of No. 2 tender passed said point on the main line track; that witness' train was going at the rate of about three miles an hour, and the speed of No. 2 at the time was from three to five miles an hour, and could have been stopped almost instantly at that rate of speed—"was under perfect control."

The distance from the point where Ellis was found to the hump ladder switch, where Long stopped his engine, is variously estimated by witnesses as being from eight to twenty-five feet, one of the plaintiff's witnesses having testified it was only eight or ten feet. It was shown that Ellis's lantern was lying on the ground a few feet from where he was lying, with the light extinguished, and that the distance from the engineer's seat to the rear end of the tender of No. 2, was forty-one feet.   It was testified by one or more of plaintiff's witnesses that it was Ellis's duty as brakeman of No. 45 to protect his train from collision with Long's train in its movement into the hump ladder track, and to give signals and throw the necessary switches for that purpose, and that as No. 45 was in an exposed position on the ladder track when Long's train entered the hump, it was necessary for some one to throw the switch leading into No. 60 or 61 hump tracks to prevent such collision.   It was also shown that no other member of the crew of No. 45, and none of the crew of Long's train threw the switch which guided Long's train of cars into track 60, and there was no other employee of the defendant company on the ground except Ellis to throw these switches.   It was also testified by plaintiff's witnesses that as soon as Long had deposited his cars in hump tracks 60 and 61

and had cleared the ladder and thoroughfare tracks with his engine and tender, it was Ellis's next duty to line up the double switches, and also the switch from the thoroughfare into track 34, in order that the way might be clear for the movement of his own train from its position on the "hump" into track 34.

Excepting certain evidence which need not now be adverted to, the above constitutes the substance of all the evidence before the jury which must be taken as true in connection with the ground of demurrer now under consideration; and it has been stated in what may seem to be unnecessary detail for the reason that it is partly circumstantial.

[12, 13] The circumstances clearly show—in fact it seems to be admitted by defendant's counsel—that Ellis was struck by the rear end of defendant's No. 2 tender on the north bound main line track and thereby received the injuries which caused his death, but it is argued that Ellis had no duty to perform in the place he was, and it is not shown why he was there. We do not think, for the purposes of this demurrer, that these questions are material. The inquiry is whether Ellis was guilty of negligence which was the sole proximate cause of his injury, and even if it be conceded that he had no duty to perform at that particular spot at that particular time, the mere act of going there could of itself be considered, at the most, as only *contributing* to the cause of the injury and not the *sole* proximate cause thereof.

The rule of law as to when an act of negligence is to be considered the proximate or remote cause of an injury is clearly and comprehensively stated in *Allison* v. *Fredericksburg*, 112 Va. 243, 71 S. E. 525, 48 L. R. A. (N. S.) 93. In that case Judge Harrison, quoting from Judge Keith's opinion in the case of *Fowlkes* v. *Southern Railway Company*, 96 Va. 742, 32 S. E. 464, says:

"In the last named case, Judge Keith, speaking for the court, quotes the language of Justice Miller with approval, and further says: 'It is not only requisite that damage actual or inferential should be suffered, but this damage must be the legitimate sequence of the thing amiss. The maxim of the law here applicable is that in law the *immediate* and not the *remote* cause of any event is regarded; in other words, the law always refers the injury to the proximate, not the remote cause. If an injury has resulted in consequence of a certain wrongful act or omission, but only through or by means of some *intervening cause*, from which *last cause* the injury followed as a direct and immediate consequence, the law will refer the damage to the last or *proximate* cause, *and refuse to trace it to that which was more remote*. To the proximate cause we may usually trace consequences with some degree of assurance, but beyond that we enter a field of conjecture where the uncertainty renders the attempt at exact conclusions futile. If the wrong and the resulting damages are not known by common experience to be naturally and usually *in sequence*, and the damage does not, according to the *ordinary course of events* follow from the wrong, then the wrong and the damage are not sufficiently conjoined or concatenated as cause and effect to support an action.' ". (Italics supplied.) *Gunter's Admr.* v. *Southern Railway Company*, 126 Va. 565, 101 S. E. 885.

Applying this principle to the evidence in this case, we are of the opinion that even though Ellis's act in going between the tracks was an act of negligence on his part, the jury would have been justified in finding that it was only the remote cause of his injury, and that the intervening act on the part of defendant, from which the injury followed as a *direct and imme-*

*diate consequence,* was the proximate cause. But, however that may be, in no event could the jury have been justified, under the circumstances, in finding that such act on the part of Ellis was the *sole* proximate cause.

[14] It is also argued that Ellis might have crossed the thoroughfare track immediately behind No. 104 tender, and have stumbled and fallen under the tender, or might have walked into it while looking in the opposite direction. We find no evidence in the record to show that the injury occurred under any of these circumstances, or from which the jury might have fairly drawn any of these inferences. The evidence shows that at the moment Ellis was struck he was almost directly opposite the engineer's seat in No. 104 engine. Therefore, in order to have crossed the thoroughfare track behind the tender and reached that position, he would have had to wait until the tender in the rear of 104 engine had passed, cross the track, and then catch up with the cab of the engine, which was traveling south at a speed of about three miles an hour. On the other hand, the evidence shows that Ellis was seen in the proximity of the double switches after his engine had stopped on the hump, and before Long's train had entered the hump ladder; that it was his duty as brakeman to look out for the defendant company's interests by throwing the necessary switches or helping out anywhere a move was to be made; that there was no one excepting Ellis who could have thrown the switches to let Long's train into hump tracks 60 and 61, and that his next duty was to turn the necessary switches to let his own train out of the hump ladder into track 34. The fairest and most reasonable inference to be drawn from these circumstances is, that after throwing the switch or switches necessary to let Long's train into hump track 60 and at the same time

protect his own train, Ellis crossed the thoroughfare
ahead of Long's train, and, at the time he was struck,
was either waiting between the tracks until Long's
train cleared or else walking north to get back around
the rear end of Long's tender, and the jury would
have been justified in so inferring and finding from the
evidence.  And although Ellis was not engaged in the
actual performance of any special duty at the immediate
time his injury was inflicted, we think all the existing
circumstances, as hereinbefore deduced from the evi-
dence, coupled with the fact that he was carrying his
brakeman's lantern at the time he was struck, would
have justified the jury in drawing the inference, and
so finding, that Ellis was acting in the performance
of his duties at the time of the injury, and in going
between the tracks was seeking to serve his employer's
interests.

[15] "Upon a demurrer to the evidence, the testi-
mony of witnesses for the demurree must be accepted
as true unless inherently incredible, or judicially known
to be untrue; and if several inferences may be drawn
from the evidence, differing in degrees of probability,
those most favorable to the demurree must be adopted
unless forced, strained or manifestly repugnant to
reason.  *Horner* v. *Speed,* 2 Pat. & H. 616; *Washington
& O. D. R. C.* v. *Jackson,* 117 Va. 638, 85 S. E. 496.
This is the penalty imposed for withdrawing the case
from the consideration of the jury who are the proper
triers of questions of fact."  *Wolonter* v. *U. S. Casualty
Co.,* 126 Va. 156, 101 S. E. 58; *Duncan* v. *Carson,* 127
Va. 306, 103 S. E. 665, 105 S. E. 62.  Only those
inferences can be drawn against the demurree which
*necessarily* flow from the evidence; and it is the duty
of this court to draw every inference in favor of the
plaintiff from the evidence which the jury might have

drawn.  *Parrish* v. *Pulley*, 126 Va. 319, 101 S. E. 869;
*Zirkle* v. *Allison*, 126 Va. 701, 15 A. L. R. 38.

Thus, in *Goshen Corp.* v. *Tolley's Admr.*, 134 Va.
404, 114 S. E. 728, where there was evidence from
which the jury might have inferred that the decedent
at the time of the accident was not engaged in the
interests of his master but "was on a frolic of his own,"
and also evidence from which the jury might have
inferred that the decedent was attempting to advance
the interests of his master at the time of the accident,
it was held that the latter inference must be adopted
by the court as being the one more favorable to the
demurree.

We are, therefore, of opinion that the trial court
was right in overruling the demurrer embraced in
defendant's assignment of error (b).

The remaining ground of demurrer to be considered
under defendant's assignment of error (c) is:

"That the plaintiff's intestate assumed the risk of
receiving the injuries complained of."

The doctrine of assumption of risk is clearly and
comprehensively stated by Judge Cardwell in the case
of *Chesapeake and Ohio Ry. Co.* v. *Meadows*, 119 Va.
33, 89 S. E. 244, in this language:

[16] "The true rule of law deducible from the author-
ities is, that the servant assumes all the ordinary,
usual and normal risks of the business after the master
has used reasonable care for his protection, and also
all such other risks as he knows of, or which were so
unquestionably plain and clear that he must have
known of their existence and their danger to him."

[17] Eliminating as before, and as we are bound
to do, all question as to defendant's negligence, the
inquiry is, in the consideration of this ground of de-
murrer, whether under the rules applicable to demurrers

to evidence, the evidence shows that the injury received by plaintiff's intestate was one of the normal and ordinary risks of his employment, or one that he knew of at the time of the occurrence. As has been shown, Ellis was struck and injured by defendant's No. 2 engine and tender while running backwards through the company's yard at night. It appears that this engine had previously taken a train of passenger cars into Byrd Street station from the north, and, after detaching the cars, was backing up the north bound main line track on its way to the ash pits. We think it may be said without discussion that, although there is no evidence to show that Ellis knew or had reason to know that that particular movement was to be made at the time, the jury might have found that it was not an unusual one and was, therefore, a movement which he, as a yard employee, had reason to anticipate, and of which he assumed the risk; provided, it was made in the usual and customary manner, and was safe guarded by the usual precautions for the safety of the yard employees, in accordance with the rules of the company and what the said employees had the right to expect. In order to determine therefore whether Ellis assumed the risk of the injury he received, it becomes necessary to ascertain from the evidence whether No. 2 engine and tender were being conducted through the yards at the time of the accident under the usual and customary circumstances, and with the precautions provided by the company's rules in regard to such movements.

The following rules were read to the jury from the defendant company's rule book:

"When cars are pushed by engines, except when shifting and making up trains in yards, a white light must be displayed on the front of the leading car at night.

"Engines running backward at night, without cars, or at the front of a train pulling cars, white light at 'A'." And in connection with the last named rule a diagram of the rear end of a tender was exhibited to the jury showing where said light should be placed. It is true defendant's witness, H. P. Mayo—the engineer in charge of No. 2 engine and tender when it struck Ellis—denied that either of the above rules applied to an engine and tender while backing through the company's yards on the main line track, claiming that they were only applicable to an engine and tender backing through the streets of the city, or on the main line outside of the yards. No official or other employee of the defendant company was called to substantiate this statement and interpretation of the rules. But the rules speak for themselves. The testimony of this witness on the subject appears to be evasive and contradictory, but it is patent he was eager to have the jury believe that on the night of the accident the light was kept on the tender while passing through the yards and until they reached the round-house. In answer to a question by the court he said: "I had to be sure that my light was on the back of the tank, because we are required, you know, to have a light on the back of our tank before leaving the Byrd Street station. It was my duty to see that the fireman examined the back of the tank and that this beacon light was in its proper position."

P. E. Laneave, the fireman of No. 2 engine, another of defendant's witnesses, on direct examination, also testified:

"Q. Just state to the jury where you were on the engine or tender, or wherever you were, when the engine was moving from Byrd Street?

"A. I was riding the tank, taking the place of what

we called a tank rider, as we did not have a tank rider down there at night, and as was the custom we rode it ourselves when he wasn't there; and I rode the tank until we passed Bowe street a hundred feet maybe; and I then got down and got back into the cab; during that time Mr. Mayo was ringing the bell, and when I got back in the cab I took hold of the rope and rung the bell myself, to attract the attention of the signal man at the tower, so as to get the signal to proceed on to the engine yard.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. Where were you stationed while riding on the tender?

"A. Standing on the man hole there, I don't know how many feet from the rear of the tank, or the front part of the engine—we were pushing and running backward at the time.

"Q. Why were you in that position?

"A. Why was I?

"Q. Yes.

"A. Well, it is customary for us to have a tank rider, and I was riding there for the protection of the public and for the safety of our ownselves as well as of the public.

"Q. Was there any light on that tender?

"A. Yes, sir; there was a big square lamp that we call a 'beacon light' placed on the rear of the tender, and I also carried a hand lantern in my hand that we use to give signals when crossing streets or at any place where the public is in danger, to give signal to the engineer to stop or proceed."

From the above evidence and other facts and circumstances which we will not undertake to detail, the jury would have been warranted in finding not only that the rules of the defendant company were intended

to require, but it was customary, that a light be placed on the rear end of a tender pushed backward at night from Byrd Street station through the streets of the city, into and through the yards on the main line track; and that it was also customary to have a tank rider or lookout during such movements. It would have been unreasonable to suppose either that the rules required, or it was the custom, to have such a light and lookout when leaving Byrd Street station and then remove or dispense with both of these agencies as soon as the engine reached the yard limits. Such being the case the yard employees had the right to expect these precautions to be taken by the company in order that they might have some warning of the entry into the yards of a regular passenger engine running backward on the main line track. As far as the evidence discloses such employees had no other means of knowing when such movements were to be made, or when to expect them, and could not be charged with knowledge of the danger when executed contrary to custom or the rules of the company.

It is not disputed that the fireman abandoned his position as lookout shortly after No. 2 engine passed Bowe street; that there was no lookout on the tender at the time Ellis was injured, and that neither the engineer nor fireman saw Ellis or knew they had struck him until after they reached the roundhouse. As to whether there was a light on the tender at the time the evidence is in conflict.

It was testified by defendant's witnesses, H. P. Mayo and P. E. Laneave, engineer and fireman, respectively of No. 2, that a bright light was burning on the rear end of the tender when they left Byrd Street station, and that the light was still burning when they reached the roundhouse, though they admitted that the

lantern or "beacon light" was set on a cross beam of the tender and was not fastened in the slot provided for the purpose. It was also testified by engineer Thomas Long that he saw the light on the tender when it came out of Broad street three quarters of a mile or more from where he was at the time, but this witness does not say that the light was on the tender when it passed him near the double switches at the time Ellis was injured, or that he saw it after the tender left Broad street.

Plaintiff's witness, E. L. Moon, who had worked as brakeman for the defendant company for several years and was on duty in Boulton yards the night of the accident, testified that he had finished his duties for the night when he heard of the accident, and according to his custom was walking south between the north bound main line and thoroughfare tracks when he met No. 2 engine and tender coming up the main line on the way to the roundhouse. His testimony in regard to the light was as follows:

*"Direct examination.*

"Q. I will ask you if it had a headlight or anything on the back of the tender at that time?

"A. I didn't see anything.

"Q. Did it have a pilot on the back there?

"A. No, sir; I didn't see anyone on the tank either. I cannot say that I paid really special attention to it, but I came around behind the cars and saw him coming. I thought it was a yard engine at first, there was no one on the back of it nor no light burning on it, as I could see, and I think my eyesight is all right; I waited until he passed and then went on down towards where the accident occurred.

"*Cross examination.*

"Q. Where did you see No. 2 that night?

"A. Just around from the yard office, as I came around across 31 and 34 tracks, going home, he was backing up.

"Q. That was after the engine had passed the place Mr. Ellis had been hurt?

"A. Yes, sir.

"Q. How far north of it was it?

"A. Well, to my best judgment, three hundred feet or probably a little more.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. Had No. 2 passed you when you got on the clearance space between the thoroughfare and main line track?

"A. He was passing me backing up; I stood there until he cleared me, and then walked on around.

"Q. You said you saw no lamp on there?

"A. I did not notice any.

"Q. You didn't look, did you?

"A. I kind of looked it over, but didn't see any light there.

"Q. Do you say you did not see any there or there was none there?

"A. No; I can only say I didn't see any.

"Q. Then you didn't say there was none on there?

"A. I didn't say there was none on there, but said I didn't see any, and I looked.

"Q. Do I understand you to say that there was no light on there, or that you did not see any light there?

"A. I did not see any light on it.

"Q. How far was the engine of that tender from you when you first saw it?

"A. I could not tell you exactly; he was pretty close

to me.   I stepped back on No. 34 track to let him clear me; I stepped clear of the main line, anyway, to let him clear me, and then walked on down the main line to my designation point I started for."

R. M. Allen, another witness for plaintiff and an employee of defendant company, testified he was working for defendant at the time of the accident to Ellis, and he saw No. 2 engine and tender 150 or 200 feet north of Bowe street shortly before it struck Ellis.   Upon being asked on direct examination whether anyone was riding the tender to keep a lookout, and whether there was a light on the rear end of the tender at the time it passed him, witness answered:

"A. There was no one riding it, and there was no light on it that I saw.

"Q. You looked at it, did you?

"A. Yes I saw the engine.

"Q. You were interviewed shortly after that, were you?

"A. I was.

"Q. And that was your statement then as it is now?

"A. It was.

"Q. You made a statement while it was fresh in your mind?

"A. I did.

"Q. You could have seen it.

"A. Yes; I could have seen it.

"Q. Did you look at the engine and tender when the rear end of the tender came by you?

"A. I didn't pay any more attention to it than any other engine going by from Elba station.

"Q. But it was backing towards you, was it?

"A. It was backing to me, yes, at the time it passed me.

"Q. Did you tell the jury there was no light on it, or no pilot on it?

"A. There was no person riding the rear of that engine, and there was no light as I could see; if there was it was not visible to me."

On cross examination the witness said that at the time he saw No. 2 engine and tender he was on his way from the freight depot, going to Boulton yards, up to the pit to get off duty; he was going up on an engine on the thoroughfare track which had stopped and witness was standing on this track south of his own engine when No. 2 came up the main line.

"Q. You say you saw no lamp on it?

"A. No lamp whatever that I could see; if it was there it was not visible to me.

"Q. You stated also, I think, that you did not pay any more attention to that engine than you did usually to any other engine?

"A. On the main line—not on the yard but on the main line.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. Do I understand you to say that there was no lamp on the tender of No. 2 or that you just did not see it?

"A. I say if it was there I did not see it.

"Q. That is not what I asked you; I asked you did you say you did not see it, or that it was not there.

"A. I did not see it.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. Then you could not positively say that the lamp was not on there.

"A. No.

"Q. But you do say you did not see it.

"A. I did not see it.'

"*Re-direct examination.*

"Q. You say you saw the end of the tender as it came to you, and you looked at it and never saw any light on it?

"A. No, sir; I never saw any light on the rear of the tender at all."

Vaughan, conductor of No. 104, a witness for the plaintiff, testified that he was walking down the main line track with yard master Grainger, and met No. 2 engine and tender about 180 feet south of the point at which the injury occurred; that he heard the exhaust of the engine but did not pay any attention to it, and Grainger took him by the arm and told him to step off; that he did not see any lookout on the tender or any light on it. Although it was testified by Mayo and Laneave that they took roundhouse foreman Miller to see and examine the light on the tender after they reached the roundhouse and learned they had struck Ellis, neither Miller nor yard master Grainger, two of defendant's employees who occupied responsible positions in the yard, and whose attention was drawn to the engine under special circumstances, were placed on the stand by the defendant to testify on the subject.

[18, 19] In view of all the evidence, both direct and circumstantial relating to the question, we are of the opinion that the jury might have found that there was no light on the rear end of No. 2 tender at the time Ellis received his injury, and such being the case, it is the duty of this court to so find. The rule is well established that when the question is one upon which fair minded men may differ, and the jury might properly find either for or against the plaintiff, upon a demurrer to the evidence, this court must find in favor of the demurree. *City of Richmond* v. *Rose,* 127

Va. 772, 102 S. E. 561, 105 S. E. 554; *Virginia Railway and Power Company* v. *Oliver*, 133 Va. 342, 112 S. E. 841; *Higgins* v. *Southern Railway Company*, 116 Va. 890, 83 S. E. 380; *Chesapeake and Ohio Ry. Co.* v. *Shipp*, 111 Va. 377, 69 S. E. 925.

[20] There is nothing to show that Ellis knew, or had reason to know, that the passenger engine which injured him had detached its train of cars at Byrd Street station and would back up the main line at the time it did; and, as the jury might have found that both the rules of the company and custom required a light, if not a lookout, and that neither a light nor a lookout was on the tender at the time of the injury, he is not chargeable with knowledge of the danger to which he was exposed, and cannot be held to have assumed the risk.

[21] The contention is made that because Ellis was a yard employee he assumed the risk of all dangers incident to the movement of all trains within the limits of the company's yards, without regard to the circumstances or the character of the train which injured him, and the cases of *Pittard* v. *Southern Railway Company*, 107 Va. 1, 57 S. E. 561; *Norfolk & Western Ry. Co.* v. *Belcher's Admx.*, 107 Va. 340, 58 S. E. 579; *Baltimore & Ohio R. Co.* v. *Lee*, 110 Va. 305, 66 S. E. 51; *Washington & Southern R. Co.* v. *Grove*, 113 Va. 411, 74 S. E. 148; and *Aerkfetz* v. *Humphreys*, 145 U. S. 418, 12 S. Ct. 835, 36 L. Ed. 758, are relied on in support of said contention.

It would too greatly prolong this already lengthy discussion to undertake to distinguish in detail the facts and principles of law involved in these cases from the one now under consideration, but an examination of them will show that in practically all of them the injury not only occurred in a railroad yard, but was

occasioned by a switch engine, or by a train engaged in switching or yard operations. It will also be seen that recovery was denied in each of these cases either on the ground that the railroad company was not guilty of negligence or on the ground that the negligence of the injured party contributed to or was the proximate cause of the injury. The decisions in all of these cases are based primarily upon the ground that all the employees of a railroad yard have, or should have, equal knowledge of the constant shifting of engines and cars, and making up of trains in the yard, and should, for that reason, be on the alert to guard against injury from the movements of engines and cars engaged in those operations, always to be expected under such circumstances. It has, therefore, been said in some of these decisions that the railroad company is under no obligation to a yard employee to ring bells, sound whistles or otherwise warn such employee, who is familiar with the operations of the yard, of the dangers by which he is surrounded in the movements of switch engines and shifting cars, which they know of and have the right to expect.

It seems clear to us, however, that the decisions relied on by the defendant and the reasons upon which they are predicated have no application to the facts and circumstances of this case—certainly not where the evidence is considered with respect to the ground of demurrer now under consideration. As has been stated, all of those cases arose from injuries caused by switching engines or ordinary shifting movements. Here, upon the demurrer to the evidence, it will have to be held that the injury was caused by a road engine engaged in an independent movement in running backward through the yards at night, on the main line, and, contrary to custom and the rules, without a light or

lookout, or other warning of its approach except the ringing of a bell, the sound of which might reasonably be inferred to have been drowned out by the escaping steam and exhaust from Long's engine, near which Ellis was at the time he was injured. Ellis had no reason to know or expect that this engine would come through the yard under such circumstances, and it cannot be said that he contracted to assume the risk of that unusual and dangerous operation of defendant's train.

In *Southern Railway Company* v. *Tyree's Admr.*, 114 Va. 318, 76 S. E. 341, it was said:

"A through train upon the main line has the same independence of position and action within yard limits that it has outside, and no reason can be given for exempting the engineer and fireman, engaged in the operation of a through passenger train, from exercising the same care in passing through yard limits that they must exercise elsewhere. Indeed, the yard being a place of ceaseless activity, they should be more on the alert to avoid injury because of the increased danger of harm occasioned by the environments."

In *Seaboard Air Line Railway Company* v. *Koennecke's Admx.*, 239 U. S. 352, 36 S. Ct. 126, 6 L. Ed. 324, Koennecke was run over by defendant's train while he was acting as switchman in defendant's yard, engaged in distributing the cars and clearing the track for another train. He was killed by a road engine that had just brought in another train and was backing into and through the yards of the defendant company at the time of the accident. In the course of its opinion the court said:

"We see little ground for the contention that there was no evidence of negligence. It at least might have been found that Koennecke was killed by a train that

had just come in and was backing into the yard; that the movement was not a yard movement; that it was on the main line track, and that there was no lookout on the end of the train and no warning of its approach. In short the jury might have found that the case was not that of an injury done by a switching engine known to be engaged upon its ordinary business in a yard, like *Arekfetz* v. *Humphreys*, 145 U. S. 418, 12 S. Ct. 835, 36 L. Ed. 758, but one where the rules of the company and reasonable care required a lookout to be kept. It seems to us that it would have been impossible to take the case from the jury on the ground either that there was no negligence or that the deceased assumed the risk."

The following cases are also illustrative of the distinction between those cases in which the injury is caused by a switching engine engaged in ordinary yard movements, and cases where the injury is inflicted in a railroad yard by road engines engaged in movements outside of common yard operations. *Southern Railway Company* v. *Darnell's Admx.*, 114 Va. 312, 76 S. E. 291; *Frazier* v. *Interstate Ry. Co.* (U. S. C. C. A.), 264 Fed. 98.

[22] Under the circumstances of this case the question of whether the decedent assumed the risk of receiving the injury which caused his death was a question for the jury, and after a careful consideration of the whole case, viewed within the limitations of the grounds of demurrer assigned by the defendant, and in the light of the rules applicable to demurrers to evidence, we are of opinion that the judgment of the trial court in overruling the demurrer should be affirmed. The trial judge heard the witnesses testify and had the opportunity to observe their demeanor and manner of testifying, and his action upon the

demurrer should not be interfered with unless clearly and plainly wrong.

The case will be affirmed.

*Affirmed.*

Crump, P., concurring:

I concur in Judge Chinn's opinion for the following reasons:

1. I am satisfied that the first assignment of error cannot be considered, as this court is *without jurisdiction* to entertain it. This leaves for our determination the two remaining assignments of error, which constitute the two grounds, assigned in the trial court, for the demurrer to the evidence.

2. The ground of demurrer, resting upon the contention that the plaintiff's intestate was negligent and his negligence was the sole and proximate cause of his death, is an affirmative defense and the burden of establishing it from the evidence is upon the defendant. Applying to the evidence the principles governing a demurrer to the evidence, it cannot be said that the testimony shows the facts, upon which the demurrer in this respect was based, so conclusively that the court would be justified in withdrawing the case from the jury.

The testimony bearing upon the issue as to the decedent's negligence, permissible to be considered under the governing rules of law, is vague and indefinite and leaves the question of his negligence rather a matter of speculation than a fact to be gathered either by fair inference or from direct evidence.

3. The additional ground of the demurrer, viz: That the decedent assumed the risk of receiving the injury which caused his death, involves the determination of

two questions of fact, (a) whether there was a rule of the company, or a custom in the operation of the work in its yard, which gave the yard employee a right to expect that there would be a light upon the tender of the engine in question as it went through the yard on the main track in the manner appearing in the evidence, (b) whether there was such a light upon the tender just preceding the death of the plaintiff's intestate.

There was plainly a conflict of testimony upon both of these questions, and hence upon a demurrer to the evidence the court cannot undertake to pass upon the preponderance of the evidence, but must overrule the demurrer.

The consideration of the case by this court is restricted to the two errors, which are sufficiently assigned. We can review the evidence for no other purpose than to ascertain whether the trial court was correct in its ruling that the two grounds of the demurrer to the evidence were not well taken and therefore the demurrer should be overruled. I think that Judge Chinn in his elaborate and exhaustive discussion of the case has reached a proper conclusion, and the judgment of the trial court should be affirmed.

McLEMORE, J., dissenting:

(This case is before us upon a re-hearing, the original opinion having been rendered on February 26, 1925.)

In the petition for a re-hearing counsel for defendant in error stress the point that the opinion heretofore delivered in this case was based on the fact that no negligence was proven against the plaintiff in error and that this ground of defense could not be considered by the court because it was not specifically

set out in the demurrer to the evidence, as provided in Code of Virginia, section 6117. While it is true that the previous opinion in this case states "there is no evidence to justify the jury in finding, as a fact, that defendant company was guilty of any negligence that caused or contributed to the accident resulting in the death of Warren Graves Ellis," this was merely one of the conclusions reached after a full discussion of the failure of the plaintiff to show how the accident occurred.

The controlling thought in the opinion of the court was, that no sufficient evidence had been introduced to show why the deceased had placed himself in the perilous position that brought him in contact with the engine or tender, how he got there or why he should have come in collision with the slowly moving train. And, therefore, assuming the railroad company's employees to have been negligent in operating the train, we were unable to say that such negligence either proximately or remotely contributed to the injury.

It would seem, therefore, that the failure of plaintiff in error to assign as one of its grounds of demurrer that it was guilty of no negligence, is of small moment in the disposition of this case.

It may be proper to observe, however, that this contention has been advanced for the first time in the petition for a re-hearing. Counsel for both sides in their briefs, and in the argument at the bar of the court, dealt at length with the question of the railroad company's negligence, indeed the brief of counsel for defendant in error, page 66, specifically states that the demurrer to the evidence contained as one of its grounds the absence of negligence on the part of the defendant company in the court below. We quote: "The grounds of demurrer was that Ellis had assumed

the risk of the injury causing his death, and that *the defendant was not shown to have been guilty of negligence which caused, in whole or in part, the injury and death of decedent*, and that Ellis was guilty of contributory negligence which was the sole cause of his injury and death." (Italics supplied.)

Following this statement, more than ten pages of the brief of defendant in error are devoted to a discussion of the facts, and citation of authorities in an effort to show that the railroad company's negligence caused the death of decedent.

The demurrer was doubtless argued in the lower court, and certainly in this court, on the theory that the railroad company's negligence was the outstanding issue on the demurrer to the evidence. Under such circumstances it may be seriously questioned if this objection can be raised for the first time upon a motion to re-hear.

We come now to consider the first ground relied upon by the plaintiff in error, namely:

"That the plaintiff's intestate assumed the risk of receiving the injury complained of."

A brief restatement of the happenings in the yard just prior to the accident resulting in Ellis' death may be helpful in the further consideration of this case, and especially as to the movement of engine and tender No. 2 that caused the injury to decedent.

This engine had brought in over the main line a train of cars and delivered them at the Byrd Street station. At this point the cars were detached, the train crew disbanded, and the engine and tender in charge of the engineer and fireman was taken back through the city and through the Boulton yard to the roundhouse. While thus passing through the yard about 11 P. M. the accident occurred. The engine

was backing with tender in front at the rate of five or six miles per hour, on the main line, but the fact that it was on the main line was a mere incident, it was simply using the most convenient track to reach the roundhouse. This was clearly an intrayard movement, the run having been completed when the train of cars was delivered at the Byrd Street terminus, and was just such a situation as yard employees were called upon to anticipate.

This being a yard movement and the decedent being a regular employee in the yard familiar with all ordinary activities therein, places upon the men in charge of engine No. 2 no duty of prevision as respects such employees.

"A railroad company does not owe to its employees engaged on its yard, over which engines are constantly moving, the duty of sounding whistles, ringing bells or keeping a constant lookout to warn them of dangers of which they already have knowledge. Such employees are exposed to more than ordinary peril, and should be on the alert and vigilant to guard against injury from the movement of engines and cars always to be expected." *Norfolk and Western Railway Company* v. *Belcher's Admr.*, 107 Va. 340, 58 S. E. 579; *Crowe* v. *Railroad Company*, 23 N. Y. S. 1100, 70 Hun. 37.

In *Jones* v. *Va. Ry. Co.*, 74 W. Va. 666, 83 S. E. 54, L. R. A. 1915C, 428, the engine was cut from a freight train which had just arrived over the main line, and was being taken to the roundhouse after being detached from the cars, via main line track through the yard. While the engine and tender were thus backing through the yard, in charge of a yard crew, decedent collided with the tender and was killed. Decedent was not a yard employee, but a brakeman

on the freight train that had just arrived and whose engine inflicted the injury.

A verdict for the plaintiff's intestate was rendered and approved by the trial court, but upon a hearing in the supreme court the judgment was reversed, the court saying:

"A railroad yard, with numerous tracks connected by switches, is essentially a place of danger, even in the daytime. Therein trains and engines are in constant motion at all times during the day. Of the dangers incident to the use of the yards for railroad purposes, no one is better advised than the employees whose duty requires them to be in or about the yard, or to pass through or over it. They know the danger, and that their safety therein depends more upon their own watchful care and prudence than upon the blowing of a whistle, the sounding of a bell, or the presence of a light on or about any part of the car."

It seems clear to us that no unusual movement of locomotives was in progress at the time Ellis received the injury resulting in his death, but on the contrary the operating of engines going to and from the round-house, the shifting of cars, the making up of trains and ceaseless activity in the yard of a great railroad system is to be expected and anticipated, and imposes upon those exposed to the ever present dangers thereof the duty of constant vigilance in looking out for their own safety.

They must be held to assume the ordinary risk of the service which they have undertaken to perform, and in the absence of any evidence even tending to show that the plaintiff in error was at the time of the accident moving its trains on the yard in a manner that should not have been anticipated by the decedent, there is no liability upon the plaintiff in error for his death.

Unless *Pittard* v. *Southern Railway Company*, 107 Va. 1, 57 S. E. 561, and *Norfolk and Western Railway Company* v. *Belcher*, 107 Va. 340, 58 S. E. 579, are to be disapproved and overruled by this court, they are decisive of and against the right of defendant in error to recover. See also *Washington Southern Railway* v. *Grove*, 113 Va. 411, 74 S. E. 148; *Baltimore & Ohio Ry.* v. *Lee*, 110 Va. 305, 66 S. E. 51; *Crowe* v. *Railroad Company*, 23 N. Y. S. 1100, 70 Hun. 37.

The cases of *Southern Railway Company* v. *Tyree*, 114 Va. 318, 76 S. E. 341, and *Southern Railway Company* v. *Darnell's Administrator*, 114 Va. 312, 76 S. E. 291 are relied upon by the defendant in error as declaring the law in Virginia applicable to this case and as later expressions of the court than the *Pittard* and *Belcher Cases*, *supra*.

In the *Tyree Case* the injury was inflicted by a main line passenger train running through the yard, about fifteen minutes late, at the rate of thirty miles an hour and without signals or lights of any kind. The court very properly said, with reference to the *Pittard* and *Belcher Cases:* "These cases have no application to the facts disclosed by this record."

The *Darnell Case* was not an injury to a yard employee at all, but to a locomotive engineer on a freight train operating between Manassas and Strausburg, who was injured while preparing to leave on his regular run by an engine, the crew of which knew the location of decedent's train, and knew or should have known that he was at the point where the accident occurred, yet moved the engine down upon him in the darkness of the night, "without light, without sound of bell, blast of whistle, or other signal, being on its way to a station a mile or more distant."

Both of these cases refer to the *Pittard* and *Belcher*

opinions, but the facts are so different that Judge Harrison, in the *Darnell Case*, says with reference to the principles announced and conclusions reached in those cases: "We have no disposition to recede from the doctrines announced in those cases, and are under no necessity to do so in order to reach the manifest ends of justice in the case before us."

We deem it unnecessary to prolong this opinion in a discussion of these cases, further than to say that in the *Pittard Case* the facts were very much more favorable to the contention of the plaintiff in the trial court than are the facts in the *Ellis Case*. There as here the engine was on the main line; there as here no one saw the accident nor does any one know why he was there or how he got there; there the train was running backwards *twenty-five to thirty miles an hour*, with no light on the tender, *no bell ringing and no whistle sounding;* here the train was moving at the rate of five or six miles an hour, with the bell continuously ringing and the approach of the engine observed by numbers of persons on the yard at the time; there the injured man's duties had for the time being ceased, leaving nothing for him to do at the moment but care for his own safety; here the same condition existed; there a demurrer to the evidence was sustained by the trial judge, and his ruling affirmed by the appellate court; here the demurrer to the evidence was overruled by the trial court and judgment entered for the plaintiff.

Numerous cases in other jurisdictions might be cited, some opposing and some agreeing with the conclusions we have reached, but to what purpose? Decisions of the court of last resort in this State should need no bolstering from other jurisdictions in order to be accepted as precedents in the deliberations

of this court, and a discussion of those cases not in agreement with the decisions of this State can only tend to confusion of thought, and result in imposing upon the bench and bar a dissertation from which can flow no practical results.

We are of opinion the trial court erred in overruling the demurrer to the evidence and entering judgment for the plaintiff in that court, and for reasons above stated, and as set out at length in the opinion rendered February 26, 1925 (by a unanimous court), think the judgment should be reversed.

HOLT, J., concurs in dissent.